Mr. Leaders, do you care if we dispose of that? Do you object?

MR. LEADERS: (Shaking head negatively.)

MR. MADER: I assume that's where you wanted it to go, Doctor.

THE WITNESS: You know, I really didn't consider that, but it's fine.

MR. MADER: We don't have to leave it on the table?

THE WITNESS: No, we do not.

MR. MADER: I'll put it right there in the trash.

THE WITNESS: All right. I have a questionnaire that I provided that was completed by Mr. Leaders.

MR. MADER: Can we mark that the next numbered exhibit?

COURT REPORTER: It's 8.

MR. MADER: I know I told you I thought there would only be seven or so.

(Exhibit Number 8 marked.)

THE WITNESS: The first page is a 1040 of 2000, a W-2 for 1999, a W-2 for 1998, W-2 for 1997, and a W-2 for 1996.

MR. MADER: Let me make the tax

EXHIBIT A



information collective Exhibit 9.

(Exhibit Number 9 marked.)

Q. (By Mr. Mader) Anything else?

A. Not specific to Mr. Leaders.

Q. Did you discuss this case with Mr. Leaders or Mr. McNees?

A. Oh, I'm sorry. I left out the -- yes. I have notes from a conversation with Mr. Leaders.

MR. MADER: Let's mark that as Number 10, please.

(Exhibit Number 10 marked.)

Q. (By Mr. Mader) Have we now got everything identified marked and isolated that you considered when forming your opinions in this case?

A. Specific to Mr. Leaders, yes.

Q. Was there anything nonspecific to Mr. Leaders that you considered?

A. Yes, there would be.

Q. What is that, Doctor?

A. I would have used information concerning -- I used some price index data, unemployment rate data, and probability of disability data.

Q. Do you have that in your file?

A. No.

Q. Okay. Where can I obtain the documents that

you looked at or considered?

A. I get it online. I have the site bookmarked so I don't really have the sites memorized, but it would be basically BLS data.

Q. It would be what data?

A. Bureau of Labor Statistics data.

Q. What specific charts or anything did you look at on the Bureau of Labor Statistics?

A. And also I didn't mention employer cost data, which is on the Bureau of Labor Statistics' home site.

Q. So if I just went to the Bureau of Labor Statistics' Web page, would I be able to locate what you relied upon based upon your verbal identification of the same there?

A. Employer costs pop on the page I have bookmarked. I think it's the home page which comes up, but it says employer costs, and you go to that.

Q. How about the other things? How would I go to the Web site to find those?

A. There are unemployment rates there and also probability of working statistics.

Q. Is that everything that you considered, Doctor?

A. No. Also, I used treasury inflation-protected bonds which I get off the Bloomberg Web site.

Q. So if I went to the Bloomberg Web site, I could just type in "treasury" -- what type of bonds?

A. Treasury inflation-protected securities tips.

Q. I could find it just by that name?

A. It is listed on the Bloomberg Web site. Again, it comes up on the page I have bookmarked, but it's on the Bloomberg Web site, yes.

Q. Anything else?

A. I don't think so. Maybe something will occur as we go through.

Q. Sure. Well, tell me what you and Mr. Leaders spoke about. You've got notes there marked as Exhibit Number 10.

A. Yes. "Worked at Dell August through end of year."

Q. He worked at Dell?

A. Yes.

Q. Okay.

A. "Left Dell due to health reasons."

Q. That was in 2000?

A. Yes.

Q. Why did he say he left Dell, Doctor?

A. Health reasons.

Q. Did he say what type of health reasons?

A. "BP went up, caused vision problems."

it's possible that his employment may have continued on had he not left voluntarily?

A. In the sense that leaving due to health is voluntary, yes.

Q. Have you had any other conversations with Mr. Leaders other than the March 23, 2005?

A. Not that I recall.

Q. Can you give us any more information other than what's contained in your notes?

A. No.

Q. You can't expound upon your notes in any manner?

A. No.

Q. Well, let's look at what's been made Exhibit Number 8, please, a questionnaire.

A. Okay.

Q. Did you verify any of the information contained in the questionnaire for economic elements of loss, employment termination, Exhibit Number 8?

A. Only the tax data.

Q. Okay. Other than that, you're relying upon what Mr. Leaders told you basically?

A. Correct.

Q. Doctor, what opinions do you intend to express in this case?

A. The present value amount of what Mr. Leaders could have anticipated earning at Philips had he remained employed at Philips.

Q. All right. And what is that, Doctor?

A. What is that amount?

Q. Yes.

A. I should amend my last statement. It's the amount less what he earned at Dell.

Q. Did you consider anything else as far as offset or mitigation?

A. No.

Q. Did you consider any severance pay he may have received from Philips?

A. No.

Q. Would you agree with me if he received severance pay from Philips, that that should be considered as an offset?

A. I don't know. I don't have an opinion about that.

Q. Okay. So all you considered was the Dell income?

A. Yes.

Q. How much was that Dell income that you offset? I assume you offset that from the historical wage loss; is that correct?

A. I did.

Q. That's what you're calling back pay?

A. I don't think I referred to it in any way.

Q. I think what you've said -- historical lost earnings. That's what I would consider back pay, basically pay from the date he was terminated until -- was the day of your report that you calculated that to?

A. No, that was ---

Q. Or was it until trial?

A. Well, it would be to his 53rd birthday, which is -- what has already past. It would be January 31, 2005, was Mr. Leaders' 53rd birthday. It would have been at that point -- was what I would have considered historical and post that in the future.

Q. Let's confirm -- what was the date you started your calculation from?

A. Started what?

Q. The historical lost earnings.

A. February 15, 2001.

Q. Was the date you started the calculation?

A. The historical earnings, yes; the loss of historical earnings.

Q. Why did you pick February 15, 2001?

A. Because he worked at Dell until February 2001, so I didn't calculate -- didn't consider anything prior

to that.

Q. Okay. And then you stopped at January 31, 2005?

A. Yes.

Q. Okay.

A. For historical earnings.

Q. What is the figure you arrived at?

MR. LEADERS: Can I ask a question here? What ---

MR. MADER: Excuse me, Mr. Leaders. I'm conducting the examination at this time, sir.

MR. LEADERS: All right.

THE WITNESS: $413,649.

Q. (By Mr. Mader) And that includes Dell offset. Correct? Or that's the amount after you give him credit for working at Dell?

A. Correct.

Q. How much money did you give him credit for working at Dell?

A. I did not take that into account specifically. I simply started calculation after he discontinued working at Dell.

Q. So that's not offset at all? You just -- you didn't take his Dell money into account at all? You just included up until the time he left Dell?

A. Yes.

Q. I'm talking about the historical lost earnings. That's separate from the front pay as I understand your report.

A. Yes.

Q. What was the baseline salary you started at to calculate historical lost earnings?

A. I don't have a calculator with me, but it would be ---

Q. I've got one right here, Doctor. It's pretty shoddy, but it's operable.

A. On your keys, some of the things are worn off, so I don't know where the equal sign is. Is it down here on the left?

Q. That big one.

A. This one? (Witness indicating.) All right. $100,644.53.

Q. $100,654.53?

A. $644.53; $100,644.53.

Q. When I say baseline, that's the figure you started with as of February 2001? He would have been earning that if he had worked at Philips?

A. No, that's really the average over that time period.

Q. Over what time period?

A. Probably February 2001 to March 24th, 2005.

Q. Okay. I want to know the salary number you started with in February 2001 and for each year thereafter to come up with the $400,000 figure.

A. I can't answer that question at this time because I don't know.

Q. You don't know how you arrived at that number?

A. No.

Q. Okay. Can you look at something here to tell us how you arrived at that number? That's a big number. I'm trying to defend Philips Electronics here and you're going to testify in this case, and I want to be able to understand what your opinions are.

A. I understand. Let me see what I can do for you.

Q. Okay. Would you like to take a few-minute break?

A. I don't need to.

MR. MADER: I wouldn't mind taking one.

(Discussion off the record.)

(Break from 11:08 a.m. until 11:12 a.m.)

Q. (By Mr. Mader) Have you been able to determine the salary amount that you started with to calculate the historical lost earnings of Mr. Leaders, specifically the salary that he would have received in

A. When we do the calculations as you indicated to do the calculations, the number from 1996 is approximately $30,000 difference.

Q. Inflation is not going to be $30,000, is it?

A. From that amount in 1996 to 2005, I don't think so.

Q. And we're off -- in 1997 doing the calculations was $90,766, and what does his W-2 say for '97 again?

A. $62,396.

Q. So about $27,000? Again, inflation is not going to be $27,000, is it?

A. I doubt if it is.

Q. So inflation, taking that into account, however you would do that, is not going to reconcile these numbers, is it?

A. Not as you indicated how to make these calculations, no.

Q. Is there any way that you reconcile them? I'm not an economist.

A. Yes, and I don't know if you want to go ahead and do the calculations or you want me to go ahead and do the calculations.

Q. I want you to go ahead and do them.

A. All right. (Witness calculating.) When I do

the calculations, beginning with $73,006 ---

Q. What year is that, Doctor?

A. 1999.

Q. Okay.

A. Increased by two percent per year and adjust for inflation on arriving at $94,652, I don't know where the difference was.

Q. So that calls into question the entirety of this series, does it not, Doctor?

A. At this time, I don't know where the difference is.

Q. So the "Wages if Employed (No Inflation)" series, which is the first series on your attachments to Exhibit Number 4, is incorrect if we rely upon historical data?

A. No, I'm not saying that. I'm simply saying the way I'm doing it now, I'm not arriving at that answer. I'd have to look at the program to see how I did it.

Q. So you don't know how you did it?

A. No, I don't know what numbers are included there.

Q. Okay. Is there any way today that we can figure out how you did it?

A. Not unless I go look at my computer and see

A. Where did the calculator go?

COURT REPORTER: It's over there.

(Witness calculating.)

THE WITNESS: The rate of inflation in 2001 was 3.42 percent.

Q. (By Mr. Mader) How did you come up with that number? Is that what the CPI said it was?

A. Basically, yes, that's what the CPI said it was, yes.

Q. 3.4 percent? I think that's what you said.

A. Whatever I said, that's what it was in 2001 based upon the Consumer Price Index numbers.

Q. So that's the figure you would have used for 2001, plus the real increase?

A. Yes. I doubt if I did it year by year. I don't recall.

Q. So you don't think you went back and figured out what the actual inflation was for each year?

A. I probably didn't do it for each year. I probably did it over the entire time period, the inflation over the entire time period.

Q. So you came up with some type of -- how did you come up with that number?

A. Would have used the Consumer Price Index in February of 2005 and the Consumer Price Index from the

then you get there; is that right?

A. Something like that, yes.

Q. Okay. Can you tell us what inflation was in 2002, 2003, and 2004?

A. What was the last one we did?

Q. 2001. You said it was 2.2.

A. 1.58 in 2002.

Q. So that would give him like a 3.58 bump.

A. 2.22 in 2003.

Q. That would be a 4.2 bump.

A. 2.66 in 2004.

Q. 4.66.

A. And then 1.5 from the average index in 2004 through February of 2005.

Q. So that would be like 3.5 then. Correct?

A. Adding two to 1.5 is 3.5, yes.

Q. So I guess historically your three percent rate of inflation is a little high that you used in some of your calculations?

A. It's a little higher than what we just went through, yes.

Q. Now, you would agree with me that the employer is not required to meet inflation with wage increases. Right?

A. Correct.

Q. Or is not required to give a raise at all?

A. Correct.

Q. You've told me how you calculated the benefits. We've been over that completely. Correct?

A. Yes.

Q. Okay. How did you figure out to go to age 69 here for Mr. Leaders? Is that just what he told you, how long he was going to work for, until he was 70, I think the questionnaire says there?

A. Yes.

Q. And you would agree with me that the Skoogs Cieka table ---

A. The what?

Q. Skoogs Cieka ---

A. Yes.

Q. --- the economists, they have a table which is standard use in economic forecasting like this.

A. Is it?

Q. That's my understanding. Am I correct?

A. I'm sure some people do use it, yes.

Q. Have you ever used the Skoogs Cieka table?

A. No.

Q. That would take about 11 years for the future work life. Correct?

A. I don't know.

 the increase that you've calculated. Correct?

A. Yes.

Q. In both settings, real and nominal? And what I mean by that, if your expected future earnings, the wages -- the increase you put for "Wages if Employed (No Inflation)," that increase is more than your real discount factor? And then if you go ahead -- and the inflation for your expected future earnings, even if you add inflation plus the increase, the nominal discount factor is still less than that. Correct?

A. Yes.

Q. So your nominal discount factor is about 4.65?

A. It would be something like that, yeah.

Q. Whereas your nominal increase, if you add inflation in, it's about five percent?

A. Yes.

Q. Did you tell me how you arrived at the inflation rate of three percent, Doctor?

A. I don't think so.

Q. How did you arrive at the inflation rate of three percent?

A. It was arbitrary.

Q. And that's not based on historical inflation? It's just an arbitrary number you picked?

A. It's just arbitrary.

Tennessee.

A. No.

Q. Did you look at or consider any materials put out by the State of Tennessee regarding wage rate inflation?

A. No.

Q. Have you ever testified in a case in Tennessee?

A. No.

Q. Do you think that -- assume for me that the wage rate of inflation for manufacturing per the governor of Tennessee is 3.55 percent. Do you think that's a better amount figure to use than yours if you're going to testify in Tennessee?

A. No.

Q. Why not?

A. Because the governor doesn't know what inflation is going to be, the governor really doesn't know what the real rate of increase is going to be.

Q. But you really don't know what the real rate of increase is going to be either?

A. No.

Q. You just picked two percent? And you picked three percent as an arbitrary number. Right?

A. The three percent doesn't matter. Remember?

Q. Did you take into consideration any duty of Mr. Leaders to mitigate his damages? He's only worked at Dell for a brief period of time in approximately four years.

MR. LEADERS: I object to that because the damages can't be mitigated in ways that suggest because of -- or damages that were caused by the stress of Philips so that's an irrelevant moot point.

Q. (By Mr. Mader) Did you hear my question, Doctor?

A. Yes.

Q. Can you go ahead and answer it subject to his objection, sir?

A. No.

Q. You can't? No, you didn't calculate any type of mitigation?

A. Other than the money that was earned at Dell.

Q. Is that something that you would typically do, come up with some type of hypothetical mitigation?

A. Sometimes.

Q. But you did not do that here?

A. No.

Q. So you don't take into account at all the fact that he hasn't had any job other than Dell?

A. That's correct.